AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### District of New Jersey

| | |
|---|---|
| United States of America<br>v.<br>Olympus Latin America, Inc.<br><br>*Defendant(s)* | Case No.<br>16-3525 (MF) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **2006 through 2011** in the county of _____ in the _____ District of **New Jersey**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371<br>15 U.S.C. 78dd-2 | See Attachment A |

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Christopher M. Duncanson, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 03/01/2016

_____
*Judge's signature*

City and state: Newark, New Jersey

Mark Falk, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## COUNT ONE
### (Conspiracy to Violate the Foreign Corrupt Practices Act)

From in or about 2006 through in or about 2011, within the United States and elsewhere, the defendant,

OLYMPUS LATIN AMERICA, INC.

did willfully, that is with the intent to further the objects of the conspiracy, and knowingly conspire, confederate, and agree with others, known and unknown, to commit an offense against the United States, that is, being a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Olympus Latin America, Inc. and its subsidiaries and affiliates and others in obtaining and retaining business for and with, and directing business to, itself and others, in violation of Title 15, United States Code, Section 78dd-2(a).

In furtherance of the conspiracy and to effect the illegal purpose thereof, the overt acts set forth in paragraph 4 of Attachment B, among others, were committed within the United States and elsewhere.

In violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Foreign Corrupt Practices Act)

From in or around June 2008 to in or around October 2009, within the United States and elsewhere, the defendant,

OLYMPUS LATIN AMERICA, INC.,

a "domestic concern" within the meaning of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(h)(l)(B), corruptly and willfully made an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a person, and aided and abetted the same, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to foreign officials for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Olympus Latin America, Inc. and its subsidiaries and affiliates and others in obtaining and retaining business for and with, and directing business to, itself and others; to wit, in order to obtain an endoscopy equipment tender at a public hospital in Brazil and obtain confidential tender information about a key Olympus competitor, defendant Olympus Latin America, Inc. made and caused to be made, directly and indirectly, improper payments totaling approximately $110,000, knowing that some or all of the money would be paid to the benefit of two publicly-employed Brazilian health care professionals.

In violation of Title 15, United States Code, Section 78dd-2.

## ATTACHMENT B

I, Christopher Duncanson, a Special Agent with the Federal Bureau of Investigation, having conducted an investigation, spoken with other individuals, and reviewed numerous documents, have knowledge of the following facts. Where conversations or statements are described, they are described in substance and in part. All dates, locations, quantities, and dollar amounts are approximate. Because this affidavit is being submitted for a limited purpose, I have not included all facts and information known to me concerning this matter.

1. At all times relevant to this Complaint, unless otherwise stated:

### The Foreign Corrupt Practices Act

a. The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign government official for the purpose of obtaining or retaining business for, or directing business to, any person.

### Relevant Entities and Individuals

b. Olympus Corporation ("Olympus") was a Japanese corporation headquartered in Tokyo, Japan that manufactured and distributed worldwide commercial photographic equipment and specialized medical imaging and surgical equipment, including endoscopes and microscopes.

  c. Olympus Corporation of the Americas ("OCA") was a New York corporation headquartered in Center Valley, Pennsylvania, that distributed Olympus' medical imaging, photographic, and surgical equipment in the United States, Canada, Central America, and South America.

  d. The defendant, Olympus Latin America, Inc. ("OLA"), was a Delaware corporation headquartered in Miami, Florida that distributed Olympus' medical imaging equipment in the Caribbean, Central America, and South America. Beginning on or about April 1, 2008, OLA was a majority owned subsidiary of OCA. OLA's employees were primarily based in Miami, Florida. OLA directly marketed and sold medical equipment to both government and private customers and worked with contracted third-party distributors to make such sales. OLA was a "domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(l)(B).

  e. Olympus Optical do Brasil Ltda. ("OBL") was a Brazil corporation and a majority owned subsidiary of OLA headquartered in Sao Paolo, Brazil. OBL distributed Olympus medical imaging and surgical equipment in Brazil. OBL was supervised and managed by OLA. OBL directly marketed and sold medical equipment to both government and private customers in Brazil and worked with contracted third-party distributors to make such sales.

### Purpose of the Conspiracy

2. The purpose of the conspiracy was for OLA and its co-conspirators to unlawfully enrich OLA by securing lucrative business with hospitals,

medical facilities, and physicians in Central and South America by making and promising to make corrupt payments of money and things of value to publicly employed health care professionals ("HCPs").

## Manner and Means of the Conspiracy

3. The manner and means by which OLA and its co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

   a. OLA, OBL, and certain of their senior management agreed to and did establish and execute a sales strategy based on providing remuneration and things of value to publicly employed HCPs, in the form of cash, money transfers, personal travel, and free or heavily discounted equipment for an HCP's personal use, in exchange for the purchase of Olympus products.

   b. OLA, OBL, and certain of their employees established a group of training centers in numerous Central and South American countries that were supposed to provide medical education but were also used significantly to provide pecuniary benefits to pre-selected HCPs who were employed by public institutions or who sat on public tender boards to influence decisions to purchase or use Olympus equipment.

   c. OLA, OBL, and certain of their employees and distributors offered, provided, or authorized local distributors of Olympus products to provide various forms of remuneration and things of value to publicly employed HCPs in exchange for the purchase of Olympus products or to influence the

5

decisions of public hospital tender boards regarding the purchase and use Olympus equipment.

   d. OLA identified and targeted certain HCPs in Central and South America who could influence purchasing decisions and labeled them as "Key Opinion Leaders" ("KOLs"). OLA provided these KOLs improper personal benefits on a routine basis, including meals, parties and expensive entertainment events to influence the KOLs to purchase or use Olympus equipment.

   e. OLA established a plan to provide KOLs who managed training centers an annual salary of $65,000 per year, a 50% discount on Olympus equipment, and a $130,000 budget for what was termed "VIP Management."

   f. OLA established a "Miles Program" to provide free travel to KOLs for personal, non-training center or business reasons.

   g. OLA offered KOLs who operated training centers between 5,000 and 30,000 miles (i.e., $5,000 and $30,000) in annual compensation under the Miles Program.

   h. OLA and certain of its employees and distributors created false contracts and paperwork that omitted or hid the various forms of improper remuneration and things of value, including the Miles Program, being provided to HCPs.

   i. OLA instructed its sales personnel and distributors that, if an HCP did not purchase Olympus equipment as agreed, that the sales

6

representative should raise the matter with the HCP and stop providing the personal benefits if the sale was not consummated.

        j.    OLA made, authorized or offered hundreds of bribes and improper payments directly and indirectly to foreign government officials, including to officials in Argentina, Bolivia, Brazil, Colombia, Costa Rica, and Mexico, totaling approximately $2,999,560.

## Overt Acts

4.    In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, within the United States and elsewhere, at least one of the following overt acts, among others:

(1)    In or about February 2007, certain senior OLA employees met in Miami, Florida, to develop a strategy to offer payments and improper benefits through training centers to HCPs in Latin America.

(2)    In or about February 2007, OLA approved a program to give $65,000 each year, a 50% discount on Olympus equipment, and a $130,000 budget to HCPs in Latin America through "VIP Management."

(3)    In or about late 2007, an OLA employee in Miami sent an email with an "Action Plan" on how to provide improper benefits to a physician who was a member of Brazil Hospital #1's[1] tender committee for endoscopy purchases.

(4)    In about late July 2008, OLA and OBL paid approximately

---

[1] The defined terms (e.g. "Brazil Hospital #1" or "Physician #1") have the same meaning as set forth in the statement of facts in Attachment A of the Deferred Prosecution Agreement.

$68,000 to the benefit of two physicians employed at Brazil Hospital #1 who were members of its tender committee.

(5) In or about March 2009, OBL paid a bribe of approximately 97,000 Brazilian Real (approximately $42,000) to an auctioneer in connection with winning an endoscopy tender for Brazil Hospital #2.

(6) In or about October 2009, OLA and OBL paid approximately $42,000 to the benefit of two physicians employed at Brazil Hospital #1 who were members of its tender committee.

(7) On or about May 20, 2009, an OLA employee in Miami, Florida sent an email to another OLA employee relating, in substance, that Bolivia Hospital would purchase an Olympus enteroscope through "competitive bidding" in exchange for OLA donating a endoscopy tower with various accessories to Physician #1's private clinic for his personal use.

(8) In or about early 2009, an OLA employee based in Miami, Florida, signed an agreement with Physician #3 whereby OLA provided free Olympus equipment to Physician #3 which could be used for his personal practice and which intentionally omitted the provision of approximately $20,000 in free personal travel for Physician #3.

(9) On or about November 12, 2009, an OLA employee in Miami, Florida sent an email confirming his promise of $10,000 of free personal travel, through the Miles Program, to Physician #1 and which stated (as translated) that the payments would be "handle[d] extra contractually."

(10) In or about December 2009, an OLA employee in Miami,

8

Florida, sent an email to employees of an OLA distributor which stated (as translated), "[Physician #2] sees the glass half empty and does not appreciate everything that we at Olympus [and its distributor] have done for him. I spoke to him about the trips he has already made . . . which no one else will consistently offer to him and about the almost 100 enteroscopies which have been done at no cost to him and the institution."

(11) In or about February 2010, an OLA employee in Miami, Florida sent an email concerning an agreement between OLA and Physician #2, which read, in part (as translated): "Dear all, I am re-sending the Agreement, eliminating clauses 3.1 and 3.4, and I also eliminated the one about the Olympus miles. As we said, we are going to offer them but we are not going to put it in writing."

(12) On or about July 28, 2010, an OLA employee located in Miami, Florida, sent an email describing payments to Physician #4 for the purpose of influencing a public tender and noted that if OLA refused to provide the free travel to Physician #4, "we could have problems with him and this could influence the issue that I have mentioned to you."

(13) On or about September 1, 2010, an OLA employee in Miami, Florida sent an email confirming that he omitted from his monthly report on Costa Rica "transactions derived from approaching physicians or personal favors to these professionals" as well as a personal donation to an HCP.

(14) On or about September 1, 2010, an OLA employee in Miami, Florida sent an email to a distributor in Honduras about an upcoming

9

donation to influence a tender with a foreign ministry of health, writing (as translated): "The document should make no allusion (mention, comment, etc) to the fact that the donation to be made, will favor or promote new business with Olympus or with [the distributor]. . . . This is extremely important. I'll explain in detail later."

Christopher Duncanson
Special Agent, FBI